# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs April 27, 2016

## RUSSELL DEAN LONG v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Washington County**
**No. 39795      Lisa D. Rice, Judge**

---

### No. E2015-01903-CCA-R3-PC-FILED-MAY 26, 2016

---

The Petitioner, Russell Dean Long, appeals as of right from the Washington County Criminal Court's denial of his petition for post-conviction relief. The Petitioner contends that he received ineffective assistance from his trial counsel (1) because a recording of a 911 call was not entered into evidence during the trial; and (2) because lead counsel told the jury during the opening statement that they would hear the recording. Discerning no error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

Casey A. Sears II, Johnson City, Tennessee, for the appellant, Russell Dean Long.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Anthony Wade Clark, District Attorney General; and Erin D. McArdle, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL BACKGROUND

The Petitioner was convicted of "first degree felony murder committed during the perpetration of aggravated child abuse and first degree felony murder committed during the perpetration of aggravated child neglect." State v. Russell Dean Long and Jessica Renee Adkins, No. E2012-01166-CCA-R3-CD, 2013 WL 5436529, at *1 (Tenn. Crim. App. Sept. 27, 2013), perm. app. denied (Tenn. Mar. 5, 2014). The trial court merged the Petitioner's convictions, and he was sentenced to imprisonment for life. Id. This court

affirmed the Petitioner's convictions on direct appeal, and our supreme court declined to review this court's decision.  Id.

The evidence at trial established that the Petitioner's two-month old daughter died "as a result of blunt force trauma."  Long, 2013 WL 5436529, at *1.  The Petitioner "was the sole caregiver" to the victim while the victim's mother, the Petitioner's co-defendant, was at work.  Id. at *22.  In the days leading up to the victim's death, neighbors heard "loud music and the victim's crying" coming from the apartment.  Id.  The victim "sustained multiple injuries in various stages of healing," including "multiple fractures of her occipital bone, fractured ribs, and subdural hemorrhages," all of which were inconsistent with accidental trauma and likely "not the result of one incident."  Id.

Initially, the Petitioner "denied any knowledge of the cause of the victim's injuries."  Long, 2013 WL 5436529, at *22.  The Petitioner later told the police that the victim had fallen off of a couch and, later still, that he had also dropped the victim during a bath, causing her to hit her head on the bath tub.  Id.  Numerous interviews and statements from the Petitioner and the co-defendant were introduced into evidence at trial.  Id. at *2-3, *8-14, *17-18.

The evidence also established that the victim began vomiting the Friday before her death.   Long, 2013 WL 5436529, at *23.  The victim was unable to hold any formula down during that weekend.  The co-defendant called the victim's pediatrician's office that Sunday.  The Petitioner answered the return phone call and told the on-call physician that the victim was vomiting without mentioning "the victim's fall from the couch or her hitting her head on the bath tub."  Id.  Based on that incomplete information, the physician instructed the Petitioner to attempt to hydrate the victim with Pedialyte.  The Petitioner's neighbor described the victim as looking "lifeless" that day.  Id.

The victim was still unable to consume any formula on Monday.  Long, 2013 WL 5436529, at *23.  That day, the Petitioner and the co-defendant took the victim along with them to a pediatrician's appointment for their older daughter.  During that appointment, the Petitioner "remained silent about both the victim's symptoms and any falls sustained by the victim."  Id.  The next day, the victim slept for approximately ten hours.  Id.  At some point during that week, the Petitioner and the co-defendant observed the victim's making "'jerking' movements."  Id.  The Petitioner's neighbors urged him to seek medical treatment for the victim, but he claimed that he could not because "he did not have the victim's birth certificate or [her] TennCare card."  Id. at *22.  The victim died on Friday, March 6, 2009, almost a week after she began vomiting.  Id. at *1.

The Petitioner filed a timely pro se petition for post-conviction relief raising numerous claims of ineffective assistance of his trial counsel.  An attorney was appointed to represent the Petitioner, and an amended petition was filed alleging that trial counsel

was ineffective for failing "to play the recording of [the Petitioner's] calling 911 for help after discovering that his child had died."

At the outset of the post-conviction hearing, the Petitioner's attorney conceded all the issues raised in the original pro se petition and the post-conviction court denied post-conviction relief with respect to those issues. The Petitioner's attorney then announced that they would present evidence solely on the issue of the 911 recording. The Petitioner's attorney also stated that, while not raised in either petition, they alleged that the Petitioner's lead trial counsel was ineffective for telling the jury during his opening statement that they would hear a recording of the 911 call.

The Petitioner testified that he had asked his lead trial counsel to play the 911 recording at trial but that lead counsel replied, "[I]t wouldn't make any difference by now." The Petitioner further testified that he believed "that if the jury would have been able to hear [the 911 recording,] then maybe . . . at least one of them might have thought different." The Petitioner explained that he thought that the recording would have shown the jury his "character" and would have proven that he did not intend to hurt the victim because "if you intend . . . to hurt somebody . . . you're not going to call 911[,] . . . you're not going to try to perform CPR."

The Petitioner's lead trial counsel was unable to testify at the post-conviction hearing due to a medical condition. Co-counsel testified that he was an Assistant District Public Defender and that he assisted lead counsel, the District Public Defender, with the Petitioner's trial. Co-counsel testified that he listened to the recording of the 911 call "many, many times" and listened to it with the Petitioner. Co-counsel further testified that the decision of whether or not to play the 911 recording "was not an easy decision to make."

According to co-counsel, there were numerous discussions between himself, lead counsel, and the Petitioner about whether to play the 911 recording. Co-counsel testified that these discussions continued "during the trial" and that they "had put a lot of thought into" the decision. Co-counsel further testified that "it was ultimately decided [that] it was not in the [Petitioner's] best interest to have that call played." Co-counsel claimed that "everybody was in agreement" as to the decision. Co-counsel explained that the co-defendant could be heard on the recording "being hysterical" while the Petitioner sounded "calm."

Co-counsel testified that had the Petitioner wanted the 911 recording played, they "probably would have played it" but that "the three of [them] . . . did not feel that it was in [the Petitioner's] best interest to play that tape." Co-counsel admitted that during the opening statement, lead counsel said the following: "[The co-defendant] says 'Call 911.' You'll hear the entirety of that 911 call. [The Petitioner] begins CPR on the baby for a

long period of time, but tragically it's too late, the baby dies." Co-counsel could not recall their discussing the fact that lead counsel had told the jury that they would hear the 911 call during trial, but he thought it could have been "one of the things that made it a difficult decision."

At the end of co-counsel's testimony, the post-conviction court asked him if the jury asked the trial court about the 911 call during their deliberations, and he testified that he did not recall the jury's asking any questions about the 911 call. The post-conviction court denied the petition. The post-conviction court found that trial counsel was not ineffective for failing to admit the 911 recording, concluding that it was a tactical decision based upon adequate preparation. The post-conviction court also concluded that there was no evidence that the Petitioner had been prejudiced by trial counsel's failure to use the 911 recording at trial. With respect to lead counsel's comment during his opening statement, the post-conviction court concluded that the Petitioner was not prejudiced by the comment. The post-conviction court pointed to the fact that the jury did not ask any questions about the 911 recording during their deliberations to conclude that either "they did not consider the absence of that tape critical in their determination" or they did not notice the inconsistency.

## ANALYSIS

The Petitioner contends that the post-conviction court erred in denying his petition for post-conviction relief. The Petitioner argues, as he did in his amended petition, that trial counsel was ineffective for failing to introduce the 911 recording at trial. The Petitioner also argues that lead counsel, specifically, was ineffective for telling the jury during his opening statement that they would hear the 911 recording during the trial. The State responds that the post-conviction court did not err in denying the Petitioner post-conviction relief.

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. Dellinger v. State, 279 S.W.3d 282, 293 (Tenn. 2009) (citing U.S. Const. amend. VI; Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)). When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993).

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," despite the fact that reviewing courts

"must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 688-89. Prejudice requires proof of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence.[1] Tenn. Code Ann. § 40-30-110(f); see Dellinger, 279 S.W.3d at 293-94. On appeal, we are bound by the post-conviction court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. Id. Because they relate to mixed questions of law and fact, we review the post-conviction court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

In determining whether trial counsel's performance was deficient, this court has held that a "petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision made during the court of the proceedings." Adkins v. State, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). "[D]eference to tactical choices only applies if the choices are informed ones based upon adequate preparation." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Contrary to the Petitioner's testimony, co-counsel testified that he listened to the 911 recording "many, many times," that he listened to the recording with the Petitioner, and that he, lead counsel, and the Petitioner had numerous discussions about whether to play the 911 recording at trial. Co-counsel testified that these discussions continued on into the actual trial and that, ultimately, they all decided it was in the Petitioner's "best interest" not to play the recording given how emotional the co-defendant was and how seemingly unemotional the Petitioner sounded. Co-counsel explicitly testified that the

---

[1] In its order, the trial court mistakenly stated that a post-conviction petitioner must prove by clear and convincing evidence trial counsel's deficiency and the resulting prejudice. However, a petitioner's burden to prove his allegations of fact by clear and convincing evidence and the Strickland analysis are two separate inquires. Dellinger, 279 S.W.3d at 293.

-5-

Petitioner was involved in and agreed with this decision. Accordingly, we conclude that the decision not to play the 911 recording was an informed tactical decision based upon adequate preparation.

With respect to lead counsel's comment during his opening statement that the jury would hear the 911 recording during the trial, "defense attorneys should strive to present a consistent theory of defense at trial." King v. State, 989 S.W.2d 319, 331 (Tenn. 1999). This court has previously cautioned that a "'trial attorney should only inform the jury of the evidence that he is sure he can prove . . . . His failure to keep [a] promise [to the jury] impairs his personal credibility. The jury may view unsupported claims as an outright attempt at misrepresentation.'" State v. Zimmerman, 823 S.W.2d 220, 225 (Tenn. Crim. App. 1991) (quoting McCloskey, Criminal Law Desk Book, § 1506(3)(O) (Matthew Bender, 1990)). To that end, a trial counsel's departure from a promise made in his opening statement without a reasonable basis for doing so can amount to deficient performance. King, 989 S.W.2d at 330-32.

Here, co-counsel testified that the discussions regarding whether or not to play the 911 recording continued during the trial, but he could not recall if lead counsel's comment during his opening statement factored into the decision not to play it. Instead, co-counsel explained that the major factor was how the Petitioner sounded in comparison to the co-defendant. As such, we cannot determine from the record before us whether lead counsel had a reasonable basis for departing from his promise to play the 911 recording for the jury or if his comment was a misstatement.

However, the Petitioner has failed to show that he was prejudiced by lead counsel's comment. The post-conviction court noted that the jury did not ask about the 911 recording during their deliberations and concluded that they either did not notice the inconsistency or that it was not a major factor in their decision. More importantly, the fact that the Petitioner called 911 and attempted CPR on the victim was presented to the jury numerous times through the Petitioner and the co-defendant's statements. Long, 2013 WL 5436529, at *2, *10, *12, *13. Additionally, the 911 recording likely would not have had a positive impact on the jury. In the recording, the co-defendant can be heard screaming, crying, and begging for the victim's life. Meanwhile, the Petitioner speaks calmly and with a flat affect to the 911 operator about his attempts to perform CPR on the victim. At one point, the Petitioner tells the co-defendant to "calm down." Accordingly, we conclude that the post-conviction court did not err in denying the petition.

CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE